### WILLIAMS' CASE.[1]

[Whart. St. Tr. 652; 4 Hall. Law J. 461; 2 Cranch, 82, note; Nat. Mag. No. 3, p. 254.] [2]

Circuit Court, D. Connecticut.    Sept., 1799.

CITIZENSHIP — EXPATRIATION — CITIZEN ENGAGING IN WAR AGAINST FRIENDLY NATION.

[1. A citizen of the United States cannot expatriate himself without the consent of his government; and no consent is to be implied from the policy of the United States to permit the naturalization of foreigners without inquiring whether their allegiance to their native countries has been dissolved.]

[Cited in Henfield's Case, Case No. 6,360.]

[2. Therefore a native American who has become naturalized under the laws of France still remains subject to indictment in the United States courts, for serving on a French privateer engaged in committing hostilities against a power at peace with the United States.]

The indictment charged, that Isaac Williams, of Norwich, in the county of New London, in said district of Connecticut, a citizen of this United States, did, without the jurisdiction of any particular state, viz: at Guadaloupe, in the West Indies, on or about the twentieth day of February, A. D. 1797, he, the said Isaac Williams, then being a citizen of the United States, accept from the republic of France, a foreign state, and then enemy to the king of Great Britain, and at open war with said king—said king then was, and ever since hath been, in amity

[1] The report in the text is substantially taken from the Connecticut Courant of September 30, 1799, the record having been resorted to, in addition, for the purpose of giving greater precision. The charge of the chief justice is the same with that given in 1 Tuck. Bl. pt. 1, append. 436, and in 3 Wheat. [16 U. S.] 82, with the exception that the omissions in the latter reports are supplied in the text.

[2] [2 Cranch, 82, note, contains only a partial report.]

with said United States—a commission and instructions to commit acts of hostility and violence against the said king and his subjects, all of which is contrary to the twenty-first article of the treaty of amity, commerce, and navigation then existing between Great Britain and the said United States, &c.

On the trial, it was admitted on the part of Williams that he had committed the acts alleged against him in the indictment, but, in his defence, he offered to prove that, in the year 1792, he received from the consul-general of the French republic, a warrant, appointing him third-lieutenant on board the Jupiter, a French seventy-four gun ship: that, pursuant to this appointment, he went on board the Jupiter, and took the command to which he was appointed; that the Jupiter soon after sailed for France, and arrived at Rochefort, in France, in the autumn of the same year; that at Rochefort he was duly naturalized in the various bureaux in that place, the same autumn, renouncing his allegiance to all other countries, particularly to America, and taking an oath of allegiance to the republic of France, all according to the laws of said republic; that immediately after said naturalization he was duly commissioned by the republic of France appointing him a second-lieutenant on board a French frigate called the Charont; and that before the ratification of the treaty of amity and commerce between the United States and Great Britain, he was duly commissioned by the French republic a second-lieutenant on board a seventy-four gun ship, in the service of said republic; and that he has ever continued under the government of the French republic down to the present time, and the most of said time actually resident in the dominions of the French republic; that during said period he was not resident in the United States more than six months, which was in the year 1796, when he came to this country for the purpose merely of visiting his relations and friends; that, for about three years past, he has been domiciliated in the island of Guadaloupe, within the dominions of the French republic, and has made that place his fixed habitation, without any design of again returning to the United States for permanent residence. The attorney for the district conceded the above mentioned statement to be true; but objected that it ought not to be admitted as evidence to the jury, because it could have no operation in law to justify the prisoner in committing the facts alleged against him in the indictment. This question was argued on both sides by Mr. Pierpont Edwards for the United States, and Mr. David Daggett for the prisoner.

Judge LAW (District Judge) expressed doubts as to the legal operation of the evidence; and gave it as his opinion, that the evidence, and the operation of law thereon, be left to the consideration of the jury.

Judge ELLSWORTH, the Chief Justice of

the United States, stated his views nearly in the following language:

The common law of this country remains the same as it was before the Revolution. The present question is to be decided by two great principles; one is, that all the members of civil community are bound to each other by compact. The other is, that one of the parties to this compact cannot dissolve it by his own act. The compact between our community and its members is, that the community will protect its members; and on the part of the members, that they will at all times be obedient to the laws of the community, and faithful in its defence. This compact distinguishes our government from those which are founded in violence or fraud. It necessarily results, that the members cannot dissolve this compact, without the consent or default of the community. There has been here no consent—no default. Default is not pretended. Express consent is not claimed; but it has been argued, that the consent of the community is implied by its policy—its conditions, and its acts. In countries so crowded with inhabitants that the means of subsistence are difficult to be obtained, it is reason and policy to permit emigration. But our policy is different; for our country is but sparsely settled, and we have no inhabitants to spare. Consent has been argued from the condition of the country; because we were in a state of peace. But though we were in peace the war had commenced in Europe. We wished to have nothing to do with the war; but the war would have something to do with us. It has been extremely difficult for us to keep out of this war; the progress of it has threatened to involve us. It has been necessary for our government to be vigilant in restraining our own citizens from those acts which would involve us in hostilities. The most visionary writers on this subject do not contend for the principle in the unlimited extent, that a citizen may at any and at all times. renounce his own, and join himself to a foreign country. Consent has been argued from the acts of our own government, permitting the naturalization of foreigners. When a foreigner presents himself here, and proves himself to be of a good moral character, well affected to the constitution and government of the United States. and a friend to the good order and happiness of civil society; if he has resided here the time prescribed by law, we grant him the privilege of a citizen. We do not inquire what his relation is to his own country; we have not the means of knowing, and the inquiry would be indelicate; we leave him to judge of that. If he embarrasses himself by contracting contradictory obligations the fault and the folly are his own. But this implies no consent of the government, that our own citizens should expatriate themselves. Therefore, it is my opinion that these facts which the prisoner offers to prove in his defence. are totally irrelevant;

they can have no operation in law; and the jury ought not to be embarrassed or troubled with them; but by the constitution of the court the evidence must go to the jury.

The cause and the evidence were accordingly committed to the jury. The jury soon agreed on a verdict, and found the prisoner guilty. The court sentenced him to pay a fine of one thousand dollars, and to suffer four months imprisonment.

The defendant was also indicted before the court, for having on the 23d of September, 1797, in a hostile manner, with a privateer commissioned by the French republic, attacked and captured a British ship and crew on the high seas, contrary to the twenty-first article of the treaty between the United States and Great Britain, said Williams being then a citizen of the United States, the French republic being then at war with the king of Great Britain, and said king being in amity with the United States. Williams' defence on the first indictment being of no avail, and having no other defence to this, he pleaded guilty. The court sentenced him to pay a fine of one thousand dollars, and to suffer a further imprisonment of four months.

NOTE. Cobbett, on July 19, 1799. thus noticed the proceedings which led to this trial: "Williams, the American Traitor.—St. Johns, Antigua, May 1. The ship William, Captain Atkinson, from Lancaster and Cork, bound to this island, has been taken and carried into Point à Petre. She sailed from Cork on the 14th ult.; and on the 17th, lat. 7° N., and long. 59° 30' W., in company with the ship Betsy, Captain Fleek, from Glasgow, fell in with a French privateer schooner of 10 guns, full of men. mostly Americans, and commanded by one Williams, an American. The privateer immediately attacked the Betsy, ·which after some resistance, struck, and was sent off for Guadaloupe; after which an engagement commenced between the William and the privateer, and continued for five hours, when the latter was obliged to sheer off. A gentleman from the West Indies, who lately had the misfortune to be taken by the French. assures us that he is personally acquainted with Williams, whose Christian name is Isaac, a native of Norwich, state of Connecticut; and that he has treated some of his countrymen, that fell into his hands, with the greatest barbarity."

Mr. Chauncey Goodrich. in a letter to Mr. Wolcott, Sept. 28, 1799 (2 Gibbs. Admin. of Wash. & Ad. 266), says: "Isaac Williams, the noted privateersman, has been tried on two indictments, on one of the articles of the British treaty, for accepting a commission and committing hostilities against the British. He offered. in evidence, residence in France since 1792 (except being here on a visit five months), and an act of naturalization; both were objected to as not being relevant, on the ground of his being an American by birth, and his allegiance unchangeable. Judge Law was for admitting it. Judge Ellsworth decided against the admission: so it went to the jury, who found him guilty. So much for naturalization acts. He is sentenced to pay a fine of one thousand dollars on each indictment, and suffer imprisonment. on each. four months. A bill is found against Holt. the Bee man. The Jacobins are impudent and cross. They think they gain ground: they are mistaken."

The question raised in the text. whether a citizen may, in any manner, without the consent of

his government, cast off his allegiance to his native country, is one which has risen in this country to more than theoretical importance. The very liberal policy of our naturalization laws, in the domestication of foreigners, has necessarily a tendency to render complicated and conflicting their duties to their native and their adopted countries. Occasions must necessarily arise when inconsistent claims to the services and the obedience of the same individuals will be put forward. One of the chief causes of the war of 1812, was the disregard paid, by the British government, to the naturalization of British subjects in this country. Within a very short period, the matter has been again agitated in the masterly dispatches of Mr. Buchanan, arising from the detention of Bergen and Ryan, during the late insurrection in Ireland. The claim of the United States for the release of these parties was founded on the assumption that, as naturalized citizens of this country, they were no longer subject to the jurisdiction of England. The tendency of the public mind in this country is unquestionably in favour of the right of expatriation. The extravagant extent to which the doctrine of perpetual allegiance has been at times carried in England; the grievances suffered by us from the practical operation of the English rule during the early part of this century, and the somewhat migratory habits of our people, have rendered the doctrine distasteful; while the apparent inconsistency with our system of naturalization, and the uniform encouragement afforded by the government to emigration, have been thought to preclude its adoption by the courts. It has also, as has been seen, been opposed by very high authority in the cabinet and in congress. But whatever may be the popular feeling on the subject, the question, as far as judicial decision extends, seems settled in accordance with the view expressed by Chief Justice Ellsworth in the text, as well as that hinted by Judge Wilson, in Henfield's Case [Case No. 6,360], viz.: that no citizen of the United States can throw off his allegiance, without the consent of congress.

The common law maxim is, "Nemo potest exuere patriam, nec debitum ligeantiæ ejurare;" that no one may throw off his country or abjure his allegiance. Story's Case, Dyer, 298a; 1 Bl. Comm. 370; 1 Hale, P. C. 68. This rule, founded on the feudal relation of lord and vassal, stamps upon any one born within the British kingdom, so indelibly the character of a British subject, that no act on his part can relieve him from its consequent duties. Entering into a foreign service without leave of the sovereign, or refusing to leave such service when required by proclamation, is a misdemeanour. 1 East. P. C. 81. No matter how solemn a mode of adjuration is adopted, the subject is still liable to punishment for offences against the government. The case of Aeneas Macdonald is an illustration of the severity of the rule. Aeneas Macdonald was a native of Scotland. At a very early period he had been taken to France; had passed there all the earlier portion of his life; and had entered the service of the king of France. He took part in the rebellion of 1745, and served under the Pretender at Culloden. Being taken after that battle, he was indicted for high treason. He claimed the treatment due by the laws of war to an alien enemy. But the judges all held, that notwithstanding his removal to France, he still remained a subject, and the jury found him guilty of high treason. He was afterwards pardoned by George II., on condition of leaving the kingdom, and never again bearing arms against it. Fost. Cr. Law, 59. The publicists, in general, speak rather vaguely on the subject, and perhaps somewhat confound the right of emigration and the right of expatriation, in themselves distinct. Grotius (book 2, c. 5, § 24) speaks of the right to leave the state at pleasure, as a natural right, but subjects it to the provisos, that we ought not to go out in troops or large companies; nor where there is a large public debt, without paying our proportion; nor when the state is engaged in war, or involved in difficulties of any kind. Wicquefort (de l'Ambassadeur, c. 11), in discussing the question whether a prince may employ foreigners in service in their native country, which he answers in the affirmative, asserts, that the citizen has a perfect right to emigrate; and that a complete severance of all ties with his native country will be effected by the taking an oath of allegiance to a foreign country. Burlamaqui is more definite in his remarks: He says (book 2, p. 2, c. 5, § 125): "It is a right inherent in all free people, that every man should have the liberty of removing out of the commonwealth, if he think proper. In a word, when a person becomes a member of a state, he does not thereby renounce the care of himself and his own private affairs. Thus, the subjects of a state cannot be denied the liberty of settling elsewhere, in order to procure those advantages which they do not enjoy in their native country." He then goes on to qualify the exercise of this right in certain instances. Expatriation, he considers, should not take place without the permission of the sovereign, though he, on his part, ought not to refuse it without important reasons; nor at an unseasonable juncture; nor when the state is particularly interested in his remaining at home; nor if there be any provision on the subject in the laws of his country, for he argues, "we have consented to those laws, by becoming members of the state." The most systematic and practical, on this subject, of these writers on political law is Vattel. He asserts an absolute right in the citizen to emigrate, where he is unable to procure subsistence in his native country; if the body of the society, or he who represents it, fails to discharge its obligations towards him; or, if the major part of the nation attempt to enact laws in relation to matters in which the social compact cannot oblige any one to submission, as in matters of religion. He claims for him a qualified right, where it is not advantageous to remain, to quit his country, on making it a compensation for what it has done in his favour: provided it be not at such a juncture that he cannot leave it without visible injury, and that all municipal regulations on the subject be complied with. But the opinions of these jurists, whatever weight they may have from the names attached to them, are obviously, in their naked state, but imperfect rules of guidance. It will not be found that, in their full extent, they have been followed in the codes of any state in modern times. Mr. Whewell, one of the latest and most judicious writers, indeed, (Elem. Mor. v. ii. p. 394,) asserts that no practical legislation has recognized that theoretical view which permits any man, on coming of age, to choose a country for himself. His country, he says, is his mother, in spite of him. Perfect freedom of intercourse, and mutual citizenship, existed among the different states of Greece; but whether any restriction was laid on emigration beyond these limits, is not known. The numerous colonies which proceeded thence, would seem to negative the supposition. The Roman law on this subject is not very clear or definite. Cicero, in his oration for Balbus (c. 13), boasts that the freedom of the Roman citizen was such that neither could he be exiled from, nor compelled to remain in, the republic against his consent. This power of retaining or throwing off at pleasure rights acquired, he calls the firmest foundation of Roman liberty. "Nequis invitus civitate mutetur: neve in civitate maneat invitus. Hæc sunt enim firdamenta firmissima nostræ liberatis, sui quemque juris et retinendi et dimettendi esse dominum." The jus post liminii was denied to those who preferred remaining in the country of their capture: and the Digest illustrates this point by the example of Regulus, lib. 49, tit. 15, l. 8. No one, however, could be the citizen of two states: if he adopted another allegiance, he was obliged to give up that to Rome. Cic. pro Balb. 28; Cic. pro Cæcina, 36; Heinecc. Ant. Rom. Jur. App. lib. 1, c. 1, § 72. A different rule prevailed at a later period, as regards the Munici-

pia of Italy. Though the liberty of changing his residence was not denied to the Municipes, yet his former obligations still remained, and he by emigration became subject to the burthens of two governments instead of one. The claims of his place of origin could in nowise be thrown aside. "Cum te Byblium origine, incolem apud Beritum esse proponas, merito apud utrasque civitates muneribus fungi compelleris." Code, lib. 4, tit. 38, l. 1. "Origine propria neminem posse voluntate sua eximi manifestum est." Id. l. 4. See also. Dig. lib. 50, tits. 1, 2. See 1 Mich. Hist. France, 49, 54. While the feudal system prevailed, this right could not have existed, as the relationship between lord and vassal could not be dissolved but by mutual consent. One of the earliest practical illustrations of the principle, in modern Europe, was the execution of General Patkul by Charles XII. Patkul was a native of Livonia, a province of Sweden, but had quitted his country when twelve years of age. He had distinguished himself in the service of the king of Saxony. He determined to remain there, and with the consent of his former sovereign, and in time of peace, sold his former possessions in Livonia. Afterwards, he was taken prisoner in an engagement between the Swedes and the Saxons. He was condemned and executed for the crime of treason by the orders of Charles. Vattel blames the conduct of the Swedish monarch as contrary to every principle of justice, contending, with some show of reason, that whatever may be the abstract doctrine on the subject, Charles had, by permitting Patkul to sell his estates, and to remain in the army of the king of Saxony, consented to his expatriation. The Code Napoleon has provided expressly for the case. There are three means by which a native of France may be de-naturalized and deprived of the rights of citizenship: 1st. By naturalization in a foreign country. 2d. By acceptance, without authority of the government, of an office in any other state. 3d. By domiciliation in a foreign country without intention of return. From this last is excepted a domicile for the purposes of commerce. Notwithstanding these provisions, no Frenchman may, under any circumstances, bear arms against his native country, without subjecting himself to the penalties of treason. Pailliet, Man. de Droit Francais, 17. In Spain, in the time of Wicquefort, there was a custom permitting any one to remove from the kingdom at his pleasure, and to throw off, entirely, all allegiance to his sovereign. Wicquefort, supra. In Russia, on the contrary, no one can leave the empire without permission from the emperor, and all subjects in a foreign country are liable to be recalled at any moment.

Having thus, cursorily, glanced at the question as it has been considered in other countries, we will proceed to detail its history in the United States. That the king of England refused to permit the naturalization of aliens in the colonies, was one of the causes of complaint enumerated in the Declaration of Independence. Before the adoption of the constitution, two states, Pennsylvania and Virginia, had provisions in their constitution and laws in favor of the right of emigration. These provisions were considered as destroying the common law rule. Murray v. M'Carty, 2 Munf. 393; Jackson v. Burns, 3 Binn. 83. That rule, therefore, in 1789, was not the law of all the states that adopted the constitution, which seems to negative the idea that the principle was adopted at the formation of our federal government, as part of the common law recognized universally in the states. The diversity prevailing in the colonies and states, prior to 1789, would afford strength to the argument that, in the national government, the common law rule of perpetual allegiance did not prevail. Sandford, V. C., in Lynch v. Clarke. 1 Sandf. Ch. 583–658. In several of the states, since the adoption of the constitution, decisions affirmative of the right of expatriation have been pronounced. In Murray v. M'Carty, ut supra, the court of appeals held this right to be original and indefeasible, and the statute which enunciated it to be merely an affirmance of an immutable principle. In Jackson v. Burns, ut supra, Chief Justice Tilghman considers the English doctrine to be inconsistent with the constitution of Pennsylvania. The court of appeals of Kentucky in Alsberry v. Hawkins, 9 Dana, 178, asserted expatriation to be a fundamental doctrine, and that the citizen, where there is no statute regulation on the subject, may in good faith adjure his allegiance. There are, however, restrictions under which the power is to be exercised. Where a person, who was appointed consul to a foreign port, declared, before he left the country, that he intended to resign his consulate and settle in a foreign country, it was held that this was held not sufficient evidence of expatriation. Woodridge v. Wilkins, 3 How. (Miss.) 360. The mere taking of an oath of allegiance in a foreign country, without a bonâ fide change of domicile, is no abjuration of the country of birth. Fish v. Stoughton, 2 Johns. Cas. 407. It is thus possible to have two allegiances co-extensive in duration. See, also, Lynch v. Clarke, ut supra. On the other hand, in Massachusetts, the common law rule is said by Chief Justice Parsons to exist in its fullest extent. Ainslie v. Martin, 9 Mass. 461. But, it is obvious, that whatever be the legislation or decisions in the states, these cannot affect or furnish a rule for the federal government. The allegiance due to the United States is a paramount one, and cannot be affected by the discharge of that due to a state. Talbot v. Jansen, 3 Dall. [3 U. S.] 133. In the case of State v. Hunt, 2 Hill (S. C.) 1, the question to whom the allegiance of the citizen was due in the first instance was very thoroughly discussed, and a majority of the court of appeals of South Carolina decided that the allegiance due to the United States, was paramount to that due to the state. Allegiance, it is to be remarked, was put in this case on no feudal ground, but entirely in the light of obedience owing to each government to the extent of its constitutional powers. The same principle as that enunciated in the previous case, was affirmed with less hesitation by Sandford, V. C., in Lynch v. Clarke, ut supra, where it is declared, after a review of the authority, that the United States alone can determine upon alienage or citizenship, and can alone bind or loose the tie of allegiance.

The first decision in the United States courts on this subject, was made by Judge Bee of South Carolina of the district court of the United States in that district, in Jansen v. Fraw Christiana Magdalena [Case No. 7,216]. It was there determined, that, although a citizen of the United States may have a right to expatriate himself and become a citizen of another country, he has no right, in his new character, to injure the country of his first allegiance by open violation of her treaties. This decision was affirmed in the circuit court. The case was then taken up to the supreme court of the United States, under the name of Talbot v. Jansen, 3 Dall. [3 U. S.] 133, where the abstract question was avoided by Chief Justice Rutledge, in giving the opinion of the court, as unnecessary to the decision, but was glanced at by Judge Patterson and dwelt upon by Judge Iredell, the inclination of both of whom was to admit the right, though in a guarded and reserved way, Judge Iredell taking the ground that though the right existed, it was not independent and indefeasible, but was the proper subject of legislative restraint, and check: and that even where there has been no legislation, it was to be received with the qualifications of the civilians, by which no man could leave without paying his debts, or when the country is at war. Next came the case in the text, and afterwards Murray v. Charming Betsy, 2 Cranch [6 U. S.] 64; McIlvaine v. Cox, 4 Cranch [8 U. S.] 209; The Bello Corunna, 6 Wheat. [19 U. S.] 152: and The Santissima Trinidad, 7 Wheat. [20 U. S.] 283.

In the first two of these the question was again avoided, and in the last it was alluded to as still open; the position, however, being taken, that if the right is to be recognized at all, it is only to be recognized when manifested by unequivocal acts of the party himself, tending to substantiate his intentions. In U. S. v. Gillies [Case No. 15,206], Judge Washington was still more reserved, hesitating even to admit that allegiance could ever be thrown off without precedent legislative permission. In Inglis v. Trustees of Sailors' Snug Harbour, 3 Pet. [28 U. S.] 99, one step further was taken; it being intimated, in the opinion of the court generally, that allegiance, when undissolved by the parties, still binds (Id. 125): and it being declared by Judge Story, that allegiance by birth is at common law perpetual (Id. 152). At last, in Shanks v. Dupont, 1d. 242, the long circuit of doubts and reservations was closed, and the court found itself back again at the position of Williams' Case, that allegiance, without mutual consent, is indissoluble. It is to be regretted, however, that Judge Story, in giving the opinion of the court, should have confined himself to a popular statement of the doctrine thus reached—making no reference whatever to the painfully discordant opinions by which this great question had been previously distressed. However distasteful it may have been in a political point of view, we are bound, therefore, now to hold that allegiance does not shift at will, but is a contract dissoluble only by consent. Nor, is it to be disguised that the repugnance with which this view was visited in the earlier stages of the republic, when the country was composed of nothing else than aliens, naturalized or revolutionized, is now yielding to a more imperial policy. Our flag is not to be trifled with by receiving a mere mercenary or coquettish allegiance, assumed for the purpose of plunder or of amusement, and abandoned when an abandonment suits the whim or interest of the party. It may now be urged that it is our policy to take the same ground with the leading nations of the world, that our sovereignty is to be retained over all who voluntarily submit to it until we consent to their withdrawal. Perhaps in this view the decisions of the supreme court, however at variance with our early interests, may be found most consistent with our permanent dignity. How far a double allegiance may be recognized was discussed in Calvin's Case, and the existence of such an allegiance approved to the country of birth and the country of naturalization. The complicated considerations arising from this position have yet to be settled by the courts.

Independently of the late correspondence in the Case of Bergen, already referred to, where the popular American doctrine is ably, though briefly maintained by Mr. Buchanan, a very clear and elaborate view of the same side of the question is to be found in a pamphlet put forth by Mr. Madison's administration, at the time of the impressment difficulties, and now understood to have been written by the late accomplished Mr. Hay, then district attorney of Virginia. (A Treatise on Expatriation. Washington, 1814.) An argument to the same effect, less full in its common law reasoning, it is true, but peculiarly rich in its citations from the civilians, was about the same time put forth by a writer said to have been Mr. Duponceau. (An Essay on Naturalization and Allegiance, Washington, 1816.) Mr. Nicholas, it is said, contributed a series of essays, under the name of Aristogiton, attacking Judge Ellsworth's doctrine with great bitterness, which are to be found in the Virginia Examiner, and Aurora, of Nov. 2 and Nov. 4, 1799; and Mr. Cooper's fertile mind was exhausted in the same crusade. See Aurora for Nov. 7 and Dec. 7, 1799, and Jan. 21, 1800. I may be permitted, also, to refer to a full and luminous disquisition on the whole subject, not yet published, by Mr. Miller, of the Philadelphia bar, in which this particular point is treated with great sagacity and learning.